# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF NEW YORK

NAQUAN REYES,

*Petitioner,*

-against-

UNITED STATES OF AMERICA,

*Respondent.*

---

**DEFENDANT'S REPLY** TO GOVERNMENT'S OPPOSITION TO PETITIONER'S MOTION TO VACATE JUDGMENT OF CONVICTION PURSUANT 28 U.S.C. § 2255, OR ALTERNATIVELY, TO REDUCE HIS SENTENCES OF <u>LIFE IN PRISON</u>

---

**1:14-cr-00227**

---

ROSENBERG LAW FIRM
Jonathan Rosenberg, Esq.
Howard Greenberg, Esq., *of counsel*
*Attorneys for Petitioner*
137 COURT STREET
BROOKLYN, N.Y. 11201
TEL: (718) 715-4845
office@rosenbergpllc.com

# **TABLE OF CONTENTS**

TABLE OF CONTENTS ......................................................................................................................... i

REYES WAS, IN FACT, DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL AND
DUE PROCESS AT SENTENCING BASED ON EITHER THE DISCRETE CLAIMS OR
THE CLAIMS – AS A WHOLE -- WHEN CONSIDERED IN THEIR TOTALITY ................... 10

REQUEST FOR RELIEF ................................................................................................................... 18

CERTIFICATE OF SERVICE ............................................................................................................ 1

# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF NEW YORK

NAQUAN REYES,

*Petitioner*,

v.

UNITED STATES OF AMERICA,

*Respondent*.

1:14-cr-00227

Petitioner, Naquan Reyes, by and through the undersigned counsel, hereby replies to the Government's opposition to his motion to either vacate his conviction or, in the alternative, to set aside his life sentence and provide him a reduced sentence pursuant to Title 28 U.S.C.A. § 2255. In support of this Reply and incorporated Points of Law, Petitioner respectfully submits the following:

We do not dispute the Government's statement that Reyes participated in a bank fraud scheme beginning in or about 2008, during which he and his coconspirators defrauded various banks and innocent third parties of hundreds of thousands of dollars.

We dispute the inflammatory, unsubstantiated allegation by the Government that "Reyes and a coconspirator suffocated" the victim to death – a statement that even the Government, in their second footnote, agrees to having no knowledge of: "There is no dispute that Reyes commissioned Thompson's murder, but the

government does not know whether Reyes, his coconspirator, or both, actually strangled Thompson." (Govt's Opposition Letter at FN 2).

Mr. Reyes, while admittedly culpable for conspiring to cause the death of the victim – did not directly participate in her murder – a question of fact that weighs heavily on the life terms imposed upon the petitioner. The Government's secondary concern, that the defendant was deprived of constitutionally effective counsel, is referenced as a parenthetical: "let alone constitutionally so[,]" albeit a heavy burden.

It is also true that Mr. Reyes and the confidential source had the following recorded exchange, which Mr. Reyes sentencing counsel bizarrely withdrew his objection to:

> CS: Please tell me you did it by yourself.
>
> Reyes: The only thing, the only thing is the lookout. Being the lookout. That's it.

Line by line, in full context, we can review the exchange objectively.

Here, Mr. Reyes denies having done anything on his own – no, he affirmatively states he was not involved in a direct murder, but was "the lookout." The CS asks again:

> CS: Who was the lookout? Who was the motorcycle guy? Why you bringing somebody else involved?
>
> Reyes: I didn't bring nobody else involved. I give you a prime example.

Instead of hearing an explanation, we get the CS's interruption of Mr. Reyes's statement – another desperate attempt to push the Government's narrative:

| | |
|---|---|
| CS: | Who's the other dude? |
| Reyes: | I give you a prime example! |
| CS: | Who's the other dude? |
| Reyes: | Wait, wait, wait, wait! Listen. Yo. |

Unsatisfied with Reyes's second affirmation, the CS pushes the Government's narrative, again:

| | |
|---|---|
| CS: | So Randi[e] was there part of this time? |
| Reyes: | No, no. No. No. No way. No. No. |

Again, Reyes states that the CS's narrative is wrong: "No, no. No. No. No way. No. No." Unable to elicit the Government's narrative, the CONFIDENTIAL source just makes it up:

| | |
|---|---|
| CS: | So Randi[e] wasn't there? Yes she was. |
| Reyes: | No she wasn't. |
| CS: | Yes she was. She was the lookout. |
| Reyes: | No she wasn't. No she wasn't. I don't want to talk about it no more, man. I'm done. I don't want to talk about it no more. |

Now we have this CS stating the Reyes: "Yes she was." That's not Reyes – that's the confidential source. And again, Reyes denies – impromptu, unaware of the recording – that "Randi[e]" was there, or even that "Randi[e]" was the lookout, because that's exactly what Reyes stated to be his own role in his initial, secondary, third, and fourth statements on this fast-paced recorded call. Excited as an utterance can be, Reyes stands up to the Government's forced narrative, again – and again –

and then, realizing that the speaker won't listen, he states that he doesn't walk to discuss it further. With no break in the recording the CS continues with the Government narrative:

> CS: So you did this yourself. Are you crazy? Why? Over a fuckin' deposit? No honestly, honestly, over a fuckin' deposit, man? What is wrong with you?

> Reyes: What was I supposed to do?

Reyes does not deny his involvement; he does not deny what he pleaded guilty to in the Court.

> CS: Over a fuckin' deposit, cuz. When did you start doing shit like that? Why? Why man? Why? I know nobody else told you the real shit, nobody else told you why you do that. They didn't tell, they probably laughed with you.

> Reyes: No, I don't tell no one. Who the fuck am I going tell? "Oh yeah, I did. . . ." Who'ma to tell?

> CS: So you did this yourself? Why man? Just, just give me an example why. All the things we ever done, I never ever did that to nobody. Never did that. So you went from a banker, a guy that's rubbing elbows with good people to [unintelligible ("UI")]. You can't be you can't be those types of people. You got to be one or the other.

> Reyes: So this is your speak from [UI]

Reyes does not dispute his involvement, and nothing the Government says can make this a conversation about Reyes acting as the direct cause of death; he does not contradict his original claim that he was the lookout, despite the desperate effort of the CS to tell the story to fit the official narrative. The CS decides to run with his own story, which does not reflect the statements of Reyes in this conversation:

CS: . . . Here you come along, go grab two fuckin' lookouts and do what you do. Why didn't you have them do it?

Reyes: They want to, but it was too sloppy. I just did it myself. I just felt it was personal. So I just did it.

Here, we have the only statement of Reyes that provides any mirroring to the statement of the CS: "I just did it myself." There's nothing here to indicate that the listener believes he is being substituted for the lookout; he is not denying being involved in the solicitation. He is admitting to being involved. He is not admitting to a killing or a murder; that is not what this statement implies: it shows he was part of the scheme, but not that he was the one – who with a coconspirator, as the Government claims in their storytelling-type way – suffocated a victim. That is <u>not</u> what Reyes implies, states, or admits to in any recorded conversation. While Reyes's association with scheming and soliciting the victim's murder is abhorrent, there is nothing to contradict Reyes's initial, honest claim that he was the lookout – not the murderer who acted upon the victim directly.

We <u>fully agree</u> with the Government's statement, made prior to their transcription of the recorded conversation (Govt's Opp. At 3):

> Contemporaneous telephone and cell-site records and other documentary evidence tied Reyes to Thompson's murder (see id. ¶ 27–34), and, in February 2014, Reyes acknowledged his participation in Thompson's murder in a consensual recording made by a confidential source ("CS").

The recording shows us that Reyes participated in Thompson's murder – but did not commit the actual act that caused her death. Reyes was also "tied" to her murder through evidence in this case; but the Government stops short of stating the

more obvious conclusion they seek to imply: that Reyes was at the scene of the murder, involved in the actual horror of the criminal act of the killing – a key reason for his life sentences in this case.

At the time of writing this Reply, I have been unable to coordinate or discuss properly an affidavit with the Petitioner due to his recent move – during the Reply deadline period – to a new prison. We spoke by phone, and in that conversation, Mr. Reyes made it clear to me that I could act as his affiant in these papers, and speak for him in these papers, because he could not provide the signature necessary for the affidavit given the difficulty of getting in contact for such an affidavit; he also wrote a letter, which states in part – in his own handwriting – the following, in sum and substance:

> I was shocked to see the affidavit of sentencing counsel... In the affidavit, he wrote that "I never told Reyes that the government would not seek a life sentence or that the Court would not impose life sentence, although I did tell Reyes that I would advocate on his behalf for a sentence of less than life imprisonment and that in my opinion I did not believe the Court would impose life imprisonment." That is a lie. I would have gone to trial if I believed that I faced a life sentence. Mr. Booth is twisting words around. It did not make sense. He clearly told me that the government put a cap of 30 years (360 months) and I could get a sentence from 1 year to 30 years and I would be taking a chance in getting a sentence in-between 1 year to 30 years. It would be up to the Judge on what she would want to give me – between 1 year to 30 years (Not Life). Jonathan, I'm going to try to call you before you receive this letter but please look me up to see where I'm at – if I'm still in Atlanta...

It is undisputed that following negotiations with Mr. Booth, the government extended a revised plea offer, according to which Reyes would still have to plead guilty to obstruction of justice murder in the second degree, but would retain his ability to appeal any sentence of more than 360 months' imprisonment. Reyes did not, however, knowingly, intelligently, or voluntary plead guilty to the revised plea offer;

he did not understand that he would face a sentence of more than 30 years in prison. He did not believe at any time that he would face a prison sentence beyond the period promised by his attorney. He understood that his conduct required a substantial, near-life term – that he would spend potentially the entirety of his adult life in prison based on the plea.

As the Government's procedural history makes clear, Mr. Reyes's claim that he believed he would not receive a sentence of greater than 30 years in prison is corroborated by their initial plea offer (their Exhibit A) dropping the two-level obstruction of justice enhancement; it was a revised plea agreement that changed one key term: 360 months became the appealability line, and not the maximum sentencing line. This revised offer is where Mr. Booth failed to properly advise Mr. Reyes of the potential outcome of his plea and sentence: Mr. Reyes did not understand that the 30 year term was not the ceiling; he believed – whether by the original offer, or by confusion as to the "revised" offer – that he would face up to 30 years, and that, as Mr. Booth explained it, he would not go above the 30-year ceiling at sentencing. While it is true that Mr. Reyes "ultimately pleaded guilty" – he did not knowingly plead guilty to the "revised plea offer" to any degree that his lawyer could have, or should have understood such an offer, and should have, explained it to his client. For these reasons, Mr. Reyes raises a credible issue of fact that should be subject to a fact-finding hearing on the effectiveness of his counsel's advocacy in these proceedings.

The difference between 30 years and life, or even 40- or 50- or 60- years and life, is the difference between constitutionally effective and ineffective assistance – a bright line, and a heavy burden that would best be satisfied by a single hearing on this very question.

Corroborating Mr. Reyes's claims are the fact that – as the Government writes – the sentencing court "addressed the outstanding challenges to the PSR: whether Reyes was subject to a two-level enhancement for obstruction of justice as a result of his calls to Ms. Tyson." (Govt's Opp. At 9). What the Government referred to as their revised plea offer was clearly not set in stone as to whether the sentencing court would even go along with the 2-point enhancement. When the sentencing court then sought to hear the recording of Reyes meeting with the CS, the Government describes Mr. Booth's withdrawal of his objection to the recording, and the enhancement challenge, as an effort to ensure to Judge Townes would somehow be distracted from wanting to listen to the recording: "Mr. Booth agreed to withdraw Reyes's objection to the obstruction enhancement in the apparent hope that Judge Townes would not listen again to the recording of the meeting between Reyes and the CS, but Judge Townes chose to listen to the recording notwithstanding Reyes's change in position." If this were Mr. Booth's hope, then he was doubly ineffective in both hoping to distract the sitting Judge and failing to advocate for his client properly once the recording – inflammatory, but not dispositive – touched the sentencing court's desk. Of course Reyes -- who was childish enough to speak on recorded lines about this case during prison calls – was unable to explain the recording to the sentencing court

where, as here, his attorney hadn't even prepared him for the potential maximum sentence of life imprisonment. Of course Mr. Reyes did not know how to dissect the recording beyond the emotional strength of its tenor, and explain the division between context and admission. As the Government stated, Reyes testified at his sentencing that he did not "mean" what he said on the recording – and for that, he was accused of lying to the Court. But of course he did not mean what the recording pulled out of context; he did not mean the words of the CS to be his words where, in the recording, they <u>were not his words</u>. The CS did not mean what Reyes did not say, and the recording was poorly explained by Reyes, who did not have a transcription or an understanding of what the recording was saying. He did not mean it – he did not know how else to say it, but he did not mean it the way the Government was meaning it. The Government was meaning it one way – to imply he committed a murder by hand – while he was meaning it to be a lookout. And those were the meanings that the Judge had to decipher. The defendant, at that time, answering for the recording without preparation, was at a grave disadvantage – and unprepared by his lawyer, who withdrew his objection for a bad faith strategy of "hoping" the Judge would forget about the issue, left his client open to a firing squad. Mr. Booth had no strategy for addressing the recording beyond his client's unlawyer-like explanations, which while easily twisted as lies, were as truthful as the recording was contextually meaningless to the question of obstruction.

What should have been objected to, argued, and counseled, turned into Reyes – a defendant alone – defending a recording that bore no similarity to the story put

forth by the Government. At the time the recording was played, anything Reyes said could not be helpful; nothing he could have said would have stood up against Government attorneys telling a sentencing court what their investigation made them believe about the truth of the recording. It was thus ultimately on defense counsel to shield Mr. Reyes from that disaster – from that self-defense at the most important time of his case. Mr. Reyes fought his sentencing alone, without the assistance of counsel, and was double punished for being his own worst counsel.

## REYES WAS, IN FACT, DEPRIVED OF EFFECTIVE ASSISTANCE OF COUNSEL AND DUE PROCESS AT SENTENCING BASED ON EITHER THE DISCRETE CLAIMS OR THE CLAIMS – AS A WHOLE – WHEN CONSIDERED IN THEIR TOTALITY

We do not disagree with the Government recitation of the law, and reincorporate our own legal citation on Reply. It is without question that a petitioner claiming ineffective assistance of counsel must show that (1) counsel's performance was objectively deficient, and (2) petitioner was actually prejudiced as a result. *Harrington v. United States*, 689 F.3d 124, 129 (2d Cir. 2012) (citing *Strickland v. Washington*, 466 U.S. 668, 687-88, 692-93 (1984)). We do not dispute the law cited here by the Government.

Indeed, the Government is not wrong when they cite the burden as "a heavy one because, at the first step of analysis, [a court must] 'indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance[.]'" (*Id.*) "The determinative question at this step is not whether counsel 'deviated from best practices or most common custom,' but whether his

'representation amounted to incompetence under prevailing professional norms.'"
(*Id.*) at 129-30. (Govt's Opp. At 12-13).

The Government's citation to the law correctly states that prevailing on a §
2255 requires the petitioner to demonstrate "actual prejudice" from identified errors.
(Govt's Opp. At 13). The question as to the prejudice in this case is one of factual
argument. The Government argues that in all five arguments put forth by Mr. Reyes,
he fails to make a sufficient showing of ineffective assistance – not even sufficient for
a hearing on the factual question.

The Government's decision to segregate the ineffective assistance claim into
five distinct points of argument is not an effective approach to ineffective assistance
law, because the effectiveness of trial counsel is to be holistically analyzed based on a
totality of the circumstances: "The reasonableness of counsel's performance is to be
evaluated from counsel's perspective at the time of the alleged error and in light of all
the circumstances . . . ." *Kimmelman v. Morrison*, 477 U.S. 365, 368 (1986). (See also
Govt's Opp. at 13). In the interest of organization, we will try to address the five
distinct points separated for us by the Government.

First, the Government is wrong when it states that Mr. Booth had to advise
Mr. Reyes to take the revised plea offer because he would have been "constrained" in
taking the case to trial based on the petitioner's proffer where he admitted to
participating in the victim's murder. This is incorrect, because – first -- nowhere in
the proffer agreement does it state that Mr. Reyes would have been compelled to
testify against himself or that further prosecution would have harmed his case where,

as here, he would have taken the position that he was a lookout, and not part of the actual murder – a position from which he has not deviated. But even without a proffer agreement, Mr. Reyes could have fought his trial case on a claim that while he had acted as a lookout, and did conspire to cause the death, he did not in fact directly cause the death. This is a defense that would have been available if he truly believed he was facing a life sentence on a plea; it is a defense that would have allowed him to make proper preparations with counsel to address the true context – and the Government demands so much context in their opposition – of the recordings. (Govt's Opp. at 14 "In analyzing whether Mr. Booth's performance in negotiating a plea agreement was deficient, context is critical.") We ask for this same context in analyzing the sentencing proceeding.

Second, the Government does admit that Mr. Booth eventually believed he could not do more to assist his client, and simply approached the government – and "sought to negotiate a straight plea agreement" (Govt's Opp. at 15). The Government moreover alleges that thanks to Mr. Reyes's sentencing counsel, he received the benefit of two separate appeals. (Govt's Opp. at 15). "As a result, Mr. Booth negotiated an agreement that provided an estimated guidelines range of 360 months' to life imprisonment, allowing a means to forcefully argue for a sentence of less than life imprisonment." (*Ibid*.) Even the Government admits that Mr. Booth created an opportunity to "forcefully argue for a sentence of less than life" – as if this was some kind of benefit provided by the plea agreement. Of course, it is this very lack of representation at sentencing that proves the Government's own point: there was no

forceful argument on behalf of Mr. Reyes – let alone competent argument – at the time of sentencing. Mr. Reyes was his own advocate.

That alone sustains prejudice on misadvising the defendant as to the plea agreement and its terms. Had Mr. Reyes known that he faced life terms, he never would have entered such an unfavorable "revised" plea.

Third, as to the Government's discussion of ineffective assistance point three – opposing Petitioner's claim that Mr. Both was ineffective for withdrawing his two-level enhancement objection – the Government alleges a procedural bar. In making this allegation, the Government uses the <u>same tactics</u> they claim that defendant is using in his 2255 petition: to recast previously made arguments under a new issue. To say that Mr. Reyes is procedurally barred from making an ineffective assistance claim because he already made the claim on appeal is absurd, and ignores the fact that Mr. Reyes has provided additional information beyond the record – new evidence – in making this claim. Recall that the Government, on page 11 of its opposition, noted that the Second Circuit declined to reach the question of ineffective assistance on the merits, deferring instead to the trial court:

> The Second Circuit found merit, however, in Reyes's challenge to Judge Townes's decision to grant him a two-level, rather than three-level, reduction for acceptance of responsibility under U.S.S.G. § 3E1.1. The circuit court held that Judge Townes committed legal error when, after granting Reyes a two-level reduction under § 3E1.1(a), she determined that she had discretion to deny him an additional one-level reduction under § 3E1.1(b). Id. at 62. In light of this legal error, the circuit court "vacate[d] and remand[ed] to allow the district court to make the pertinent findings under § 3E1.1(b) and to determine whether Reyes qualifies for the final one-level reduction." Id. Because the circuit court found that Judge

> Townes committed procedural sentencing error, it declined to address Reyes's arguments that (1) his sentence of life imprisonment was substantively unreasonable and (2) that his counsel was ineffective at sentencing. Id. at 63.

(Govt's Opp. at 11 with emphasis in bold).

There was no decision by the Second Circuit on the merits as to the infective assistance claim, and even if one were to say there was such a decision, Mr. Reyes has come forward with sufficient information beyond the appellate record to ask this Court to review the failure of sentencing counsel within a critical context: here, it is clear that Mr. Booth's failure to maintain his objection went beyond just the record, but was also compounded by his failure to properly advise the defendant, prepare the defendant to speak to the recording at his sentencing, and understand the gravity of his statements as to the recording, which was not properly or forcefully rebutted, at that same sentencing proceeding. These were patterns of conduct that, on their face, cannot be taken apart as discreet, one-of-five point analyses, as the Government wishes this Court to do. While each of the five points segregated by the Government could, on their own, show deficient performance and prejudice, all five points, combined as to any two, certainly show deficient performance leading to one prejudicial outcome.

In any event, that the Second Circuit reversed the sentencing court's original sentence on one error and declined to reach the merits on the next error alleged, does not, collaterally estop ineffective assistance claims in this case, because (a) Mr. Reyes's claim was not decided on the merits, and (b) Mr. Reyes's claim is not to be considered distinct from the other claims, when all taken together. As the

Government's legal citations properly tell us, the reasonableness of counsel's performance is a totality of the circumstances test: ""The reasonableness of counsel's performance is to be evaluated from counsel's perspective at the time of the alleged error and in light of all the circumstances . . . ." *Kimmelman v. Morrison*, 477 U.S. 365, 368 (1986). A defendant is not entitled to a "modern-day Clarence Darrow"; mere competence will suffice. *United States v. Alessi*, 638 F.2d 466, 477 (2d Cir. 1980). In addition, because "[t]here are countless ways to provide effective assistance in any given case," *Strickland*, 466 U.S. at 689, the lack of success of a chosen strategy should not cause a court to second-guess an attorney's judgments. *Cuevas v. Henderson*, 801 F.2d 586, 590 (2d Cir. 1986)." (Govt's Opp. at 13).

In asking this Court to find no prejudice, the Government argues that the imposition of a "two-level enhancement was a foregone conclusion." (Govt's Opp. at 16). This, of course, presumes that the sentencing court would have overruled Mr. Booth's objection on argument. If we had the same crystal ball as the Government, then the Second Circuit surely never would have reversed the sentencing court's decision, either. But that was not clearly a conclusion they considered "foregone" at the time of sentencing.

Fourth, the Government's argument as to their point-4 ineffective analysis claims that Mr. Booth acted with an obvious strategy is failing to make proper objections to the PSR – that "[i]t certainly would have been an understandable strategy given Reyes's guilty plea and Mr. Booth's strong desire to rely heavily on Reye's acceptance of responsibility in his pursuit of leniency from Judge Townes)."

(Govt's Opp. at 17). The Government does not believe in this analysis that Judge Townes' life sentence was, then, a foregone conclusion – and that in fact Mr. Booth had a real shot at getting the acceptance of responsibility argument knocked out despite their recordings. We do not disagree that there was a real chance on diminishing the enhancements, but for different reasons. We do not believe the records shows any strategy where, as here, the defendant fended for himself in the sentencing proceeding. If sentencing counsel's strategy was to seek leniency, then the Government's analysis was that leniency was certainly not a foregone conclusion – that life in prison was the natural outcome of these proceedings. In either view, the petitioner had no idea that there were foregone conclusions at the time he appeared for sentencing. As Mr. Reyes proffers, he would have gone to trial – he would have taken that risk over a possibility of life terms.

Finally, as to the Government's separated point five to the ineffective assistance analysis, the Government addresses what we address in detail above: calling Mr. Reyes's argument "hard to follow" the Government alleges that we claim that counsel was not sufficiently vigorous in his arguments at sentencing. Despite the lack of clarity in our argument, so alleged, the Government nevertheless dedicates four large paragraphs to the argument, conflating participation with direct cause of death. Mr. Reyes, without the assistance of his sentencing attorney, had to explain a recording that did not utter the words the Government made the sentencing court believe he had uttered – he responded in kind to the Government's misleading claims. Not a lawyer, he was given no latitude with his choice of words, while the

Government's free use of broad implications was given Biblical weight from the view of a defendant. In the same way the Government tries to tell us that participation equals presence equals committing the killing, Mr. Reyes is not used to the fictions of law that makes conspirators nearly, if not equally, as guilty as triggermen, and for that lack of knowledge, he was punished for using the Government's own words to his own defense. The Government misstated the context of the recording, and so the defendant was, of course, only permitted to either agree or explain himself; he, of course, did not have the benefit of counsel in explaining why the recording was not the way it appeared, because his attorney never did that; his lawyer never went over that recording with him for the purpose of sentencing.

The Government is permitted to make inconsistent arguments in support of legal fictions, and yet the defendant is deemed a liar should he defend himself too vigorously, especially where he is alone in his moment of judgment.

When Mr. Reyes speaks of presence, he speaks not of participation, but in actual act of murder.

As such, Mr. Reyes is not relitigating the Second Circuit's holding; Mr. Reyes is litigating the finding that his presence is equivalent to his conduct; that because he was even the lookout, he was also the killer. And these two distinctions, for sentencing purposes, are not fake – they real. They make for real distinctions. This Court is empowered to determine the question of presence versus *actus reus*, which are distinct and separate issues here. If presence is the same as conduct of committing murder in the Government's eyes, then we must narrow the issue to

clarify the language: they are not the same, the conduct is not the same, and this does matter for the purpose of sentencing.

## REQUEST FOR RELIEF

Now comes the defendant, upon this application for redress of grievances, to the United States District Court for the Eastern District of New York. Defendant moves pursuant to 28 U.S.C. § 2255 to vacate his judgement of conviction and to be released from confinement, or to correct a sentencing error, or to reduce an unlawful sentence, based on the legal reasons set forth in this application.

We ask that this Court grant a hearing as to the issues raised in these proceedings, especially on the question of counsel's effectiveness in these proceedings.

For all the reasons set forth herein, Petitioner seeks a hearing or fact-finding, and asks this Court to grant any extension for the defendant to submit additional evidence should -- in the event an in-person jail meeting is granted by the discretion of the Bureau of Prisons in their magic -- new evidence in support of this motion, including any declaration, come about, in good faith, and in deliberation of the truth.

WHEREFORE, the petitioner requests this Court issue a writ of habeas corpus commanding Respondent to produce the body of Petitioner before this court, at a time and place to be specified by this court, so that this court may further inquire into the lawfulness of Petitioner's judgment and sentence; reduce or correct the Petitioner's sentence; discharge Petitioner from respondent's custody; or/and grant Petitioner such

other and further relief to which Petitioner may be entitled under law and/or in the interests of justice.

Dated:  April 15, 2022
        Brooklyn, New York

              JONATHAN ROSENBERG PLLC

By:  *Jonathan Rosenberg*
         Jonathan Rosenberg
         Howard Greenberg, *of counsel*
         *Attorneys for Petitioner*
         137 Court Street, Fl. 2
         Brooklyn, New York 11201
         Tel: (718) 715-4845
         office@rosenbergpllc.c

## <u>CERTIFICATE OF SERVICE</u>

      Jonathan Rosenberg, an attorney duly admitted to practice before the United States District Court, in and for the Eastern District of New York, affirms that he is over the age of 18, not a party to this action, and a resident within the district, as it so happens, and did cause to be served by first-class mail and electronic mailing, ort/and ECF filing, a true copy of Naquan Reyes's 2255 Reply, on April 15, 2022, upon the following parties:

      BREON PEACE
      United States District Attorney
      Eastern District of New York
      271-A Cadman Plaza East
      Brooklyn, New York 11201
      (718) 254-7000

      NAQUAN REYES, Reg. No.: 83464-053
      FTC OKLAHOMA CITY
      U.S. PENITENTIARY
      P.O. BOX 898801
      OKLAHOMA CITY, OK  73189

      CHRISTOPHER BOOTH
      LIPMAN & BOOTH
      11 BROADWAY, Suite 1054
      NEW YORK, NY 10004
      (212) 363-6969

*Jonathan Rosenberg*
Jonathan Rosenberg